JOSEPH H. O'BRIEN, Appellant, *v.* EDWARD P. MCKINNEY, Respondent.

*Contracts — action for breach of alleged oral contract in failing to heat garage rented to plaintiff — judgment for defendant reversed.*

Appeal from a judgment of the Supreme Court, entered in the Broome county clerk's office on the 6th day of December, 1921, granting a nonsuit and dismissing the complaint.

Judgment reversed and new trial granted, with costs to the appellant to abide the event, on the ground that there was evidence to go to the jury of a contract implied in fact under which it became the duty of the defendant to heat the leased stall. All concur, except Hinman, J., dissenting, with an opinion.

HINMAN, J. (dissenting): The cause of action sought to be established by the plaintiff was for damages for breach of an oral contract on the part of the defendant in failing to heat a garage above freezing, whereby the radiator of plaintiff's automobile was frozen, causing damage in the cost of repairs and loss of use. The complaint alleged an agreement on the part of the defendant to keep the temperature of the garage at all times above the freezing point. The action was tried by the plaintiff on the theory that there was a contract implied in fact on the part of the defendant to at all times keep the temperature of the

garage above freezing; that such was the intention of both plaintiff and defendant as evidenced by their words, acts and the surrounding circumstances, even though there were no express words of agreement to that effect. In October, 1919, the plaintiff and a man by the name of Kelm, who roomed at plaintiff's home, were keeping their cars in an unheated barn. The plaintiff requested Kelm to tell him if he found a heated garage at any place. The defendant owned a garage which was divided into some thirteen stalls or compartments, each just large enough to hold one car. These compartments were completely separated by partitions and each had a door opening directly onto the street. Each compartment had its own water supply and electric light. They were numbered consecutively and under Nos. 7 and 8 there is a cellar, containing a hot water heating plant and boiler, the pipes going up through the floor of No. 7 and thence through the partitions, extending to all of the compartments and back again to the boiler. There was no device of any sort for turning the heat on or off in any one of the compartments or even at the boiler. The defendant employed a man to keep a fire in this boiler and this heating system was entirely under the control of the defendant. About the middle of October, 1919, Kelm hired one of these compartments of the defendant, namely, stall No. 2. After looking at the garage he negotiated with the defendant with reference to renting, telling the defendant in substance that he would take the garage if defendant heated it. The defendant replied that he did and that " he heated the garage above freezing point." The price was six dollars per month, the same as for the other compartments, and included electric light as well as heat. Kelm leased it, entered into possession and occupied the same until December 4 or 5, 1919. During all of this time the garage was heated. Kelm told the plaintiff that he was occupying a stall in defendant's garage and under what conditions he was occupying it. On or about December 4 or 5, 1919, when Kelm went to defendant's house to pay his rent, he found that stall No. 7 was vacant and asked defendant if he could move into that stall. Defendant said he could and handed him the key to No. 7, and Kelm handed back to defendant the key to No. 2. Kelm asked defendant at that time if he had any objection to leasing No. 2, which he was vacating, to the plaintiff. The defendant replied, " No." Kelm then called the plaintiff's house on defendant's telephone and in his presence and asked the plaintiff's wife, who answered, if plaintiff wanted that garage. She replied that she thought he did. The defendant then handed the key to No. 2 back to Kelm and told him to take it to plaintiff. Kelm gave the key to plaintiff's wife as the plaintiff was not home and she later handed it to the plaintiff. During the conversation between Kelm and the defendant at the defendant's house nothing was said as to amount of rent, heat or any other terms under which the plaintiff was to take it. That night when the plaintiff received the key from his wife he started with her in his car for Philadelphia, not having seen Kelm or the defendant. While on his trip he discovered the key in his pocket which reminded him that he had not definitely informed the defendant or Kelm that he would take the garage. He immediately sent a telegram to Kelm, telling him to get word to the defendant that he would accept the garage. Defendant replied, " Very well, good." Kelm also told the defendant that plaintiff was away for a few days and upon his return would take care of his rent, to which the defendant replied, " All right." The plaintiff was away about ten days and returning about December fifteenth at night, he put

his car in stall No. 2 of the defendant's garage, which he found heated at that time. The plaintiff paid his rent for the month of December by mailing a check to the defendant, which the latter cashed. It was not until New Year's day that plaintiff had occasion to go to the garage or use his car. When he went in to get it at that time it would not start. Apparently something had happened to the heating system for a few days later defendant called plaintiff on the 'phone and accused him of tampering with the pipes in his garage. Immediately after this conversation plaintiff again went to the garage and tried to start his car but could not. He put his hands on the heating pipe and found there was just a faint trace of heat in it. He went to the defendant's house and asked him if it was not pretty cold in there for such weather and defendant replied, " I always keep it 33 and   *   *   *   it won't freeze at that," to which the plaintiff replied, " if you are going to keep it 33 I am going to get my car out." The plaintiff went back to the garage and again tried to start his car but could not. He then got a mechanic who found that the water in the radiator was frozen. Plaintiff then brought the defendant to the garage and had the mechanic tell him what the trouble was. The plaintiff asked the defendant what he was going to do about it, to which the defendant replied, " It didn't make any difference to him; it was nothing to him." Repairs were made at a cost of $373.39 and the plaintiff suffered further loss of use of the car. Upon refusal of the defendant to pay for such repairs and loss of use, this action was brought to recover such damages. To constitute a true contract there must be a meeting of the minds. The intention of the parties must be the same. If this intention is stated in the express words of the parties, orally or in writing, it is an express contract. If it is implied from the acts of the parties under circumstances which according to the ordinary course of dealing and the common understanding of men show a mutual understanding to contract as a reasonable deduction from all the circumstances, it is called a contract implied in fact. (13 C. J. 241.) The courts recognize two classes of implied contracts. " The one class consists of those contracts which are evidenced by the acts of the parties and not by their verbal or written words — true contracts which rest upon an implied promise in fact. The second class consists of contracts implied by the law where none in fact exist — *quasi* or constructive contracts created by law and not by the intentions of the parties." (*Miller* v. *Schloss*, 218 N. Y. 400, 406.) It is the contention of the plaintiff that the facts in this case indicate a contract implied in fact by the parties to heat the garage above the freezing point. Such a covenant must be proved by implication from all the circumstances of a case, but the proof must show a meeting of the minds sufficient to constitute an agreement in fact as a reasonable deduction from such circumstances when judged by the ordinary course of dealing and the common understanding of men. If Kelm had rented for the plaintiff at the same time that he rented for himself when he made the renting conditional upon heating to a certain temperature, and if at that time he had been a duly authorized agent for the plaintiff to rent for him on the same terms and the negotiations had tended to indicate that he was acting for both himself and the plaintiff and that both leases were based on the same covenant to furnish heat, a different situation would be presented. Here we have a leasing to the plaintiff at a considerably later date with no terms mentioned at the time, no notice to the defendant in any way that the plaintiff was relying upon any express or implied warranty to heat above freezing. It is

not even shown that the defendant ever knew that the plaintiff had a water-cooled car or needed any heat in the garage. There was no notice to the defendant that Kelm was acting as agent for the plaintiff. In fact the proofs indicate that the leasing was done by the plaintiff himself. Kelm did not assume to act with authority. He telephoned the plaintiff's residence in the presence of the defendant to ask if the plaintiff would like to have "Garage No. 2," and plaintiff's wife answered that she thought he would. He had no authority until he received a telegram from the plaintiff, asking him to get word to the defendant that he would take the garage. If the plaintiff had in mind obtaining the garage upon the same covenant for heat, he failed to convey any such thought, expressly or impliedly, to the defendant, nor did Kelm indicate to the defendant in any way that the plaintiff was so minded, nor could it be gathered from all the circumstances that there was such a meeting of the minds on that subject as between the plaintiff and the defendant as to constitute a covenant to supply heat so separate and independent a part of the lease as to permit an action for damages thereon for a breach thereof. It is one thing to permit a recovery where a covenantor has expressly or in fact agreed to a separate and independent covenant to furnish heat and quite another thing where by settled authority, as in the case of a living apartment, the means of furnishing heat being within the exclusive control of the landlord, the law has implied a covenant to supply heat as a part of an implied covenant of quiet enjoyment. In the first case there may be a recovery for damages. In the latter case there must be an eviction, actual or constructive, in order to make a breach of the covenant of quiet enjoyment available. In a case of such latter breach the tenant may surrender the premises for lack of adequate heat and claim a constructive eviction in defending against a claim for rent. (*Tallman* v. *Murphy*, 120 N. Y. 345, 352; *Jackson* v. *Paterno*, 58 Misc. Rep. 201; affd., 128 App. Div. 474; *Bliss* v. *Clark*, 104 Misc. Rep. 543; *Berlinger* v. *Macdonald*, 149 App. Div. 5.) Surely no more favorable rule should be applied to a heated garage than has been applied to a heated living apartment. If there was a contract between the parties on the subject of heat it was a "*quasi* or constructive contract created by law and not by the intentions of the parties." (*Miller* v. *Schloss*, *supra*, 406.) It was simply a constructive contract implied by law as a part of an implied covenant of quiet enjoyment. Therefore, it was not such a specific covenant, express or implied in fact, as would permit a tenant to maintain an independent cause of action against the landlord for damages under such authorities as *Thomson-Houston Elec. Co.* v. *Durant Land Imp. Co.* (144 N. Y. 34, 44); *Elwood* v. *Forkel* (35 Hun, 202); *Myers* v. *Burns* (35 N. Y. 269); *Cook* v. *Soule* (56 id. 420); *Walker* v. *Shoemaker* (4 Hun, 579). The only remedy the plaintiff had was to surrender the premises for lack of adequate heat under his implied covenant of quiet enjoyment and to claim a constructive eviction. The judgment should be affirmed, with costs.